Filed 9/11/25  S.M. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.M. et al.,<br><br>    Petitioners,<br><br>    v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G065442<br><br>(Super. Ct. Nos. 17DP1327B, 17DP1328B, 17DP1329B, 23DP0184)<br><br>O P I N I O N |

Original proceedings; petitions for a writ of mandate to challenge orders of the Superior Court of Orange County, June Jee An, Judge. Petitions denied.

Martin Schwarz, Public Defender, Richard Cheung, Assistant Public Defender, and Brian Okamoto, Deputy Public Defender, for Petitioner N.C.

Dependency Defense Counsel, Karen Bladergroen; and Leslie A. Barry, for Petitioner A.L.

Orange County Parents Counsel and Fernando Acuna, for Petitioner S.M.

No appearance by Respondent.

Leon J. Page, County Counsel, Debbie Torrez, Chloe Maksoudian, and Aurelio Torre, Deputy County Counsel, for Real Parties in Interest Orange County Social Services Agency.

No appearance by the Minors.

\* \* \*

This is a writ proceeding challenging the juvenile court's termination of reunification services at the 18-month review hearing[1] and order that a hearing be scheduled under Welfare and Institutions Code section 366.26.[2] Petitioner A.L. is the mother of F.M. (daughter, age 8);

---

[1] The Orange County Social Services Agency (Agency) contends the hearing was actually a 24-month review hearing, not an 18-month review hearing and, therefore, the juvenile court was not statutorily required to make a finding of reasonable services before scheduling a hearing under Welfare and Institutions Code section 366.26. Over 24 months had elapsed between the removal of the children in February 2023 and the conclusion of the 18-month review hearing on April 21, 2025. We need not reach this issue because we conclude substantial evidence supports the juvenile court's findings that all three petitioners were provided reasonable reunification services.

[2] All further statutory references are to the Welfare and Institutions Code.

petitioner N.C. is the mother of B.M. (son, age 13) and W.M. (son, age 11); petitioner S.M. (Father) is the presumed father of all three children. Petitioners contend substantial evidence does not support the juvenile court's finding by clear and convincing evidence that reasonable reunification services were provided to them in the period between the combined six- and 12-month review hearing and the final review hearing. In addition, A.L. contends substantial evidence does not support the court's finding by a preponderance of the evidence that returning F.M. to her would create a substantial risk of detriment to F.M.'s safety, protection, or physical or emotional well-being.

We find no merit in the petitions and deny relief.

FACTS AND PROCEDURAL HISTORY

I.

THE PARTIES AND PRIOR CHILD WELFARE

PROCEEDINGS INVOLVING THE CHILDREN OF FATHER AND N.C.

Father and N.C. were together for 17 years until approximately 2015 or early 2016. They have five children together: T.M. (son, age 20), M.M. (daughter, age 18), L.M. (daughter, age 16), B.M., and W.M. Of those five children, this proceeding only pertains to B.M. and W.M.[3]

Father and N.C.'s involvement in juvenile dependency proceedings dates back to 2017, when N.C. left all five children alone overnight in a motel room and the children became dependents of the court. In 2019 and 2021, two other panels of this court issued decisions detailing the extensive history of issues involving Father and N.C., including criminal

_____

[3] T.M. and M.M. are no longer minors; L.M. was returned to N.C.'s care during the hearing that is the subject of this proceeding, and none of the issues before us in the subject petitions involve L.M.

3

allegations against Father of stalking and making criminal threats; both parents' incarceration, mental health and substance abuse issues; and domestic violence.[4] As of February 2023, when the children were removed in the current proceedings, Father had full custody of them. N.C. reported Father did not permit her to see the children after the prior child welfare proceeding closed.

A.L. is the mother of F.M., and Father is F.M.'s presumed father. A.L. became romantically involved with Father while she was working as a nanny for Father's older children. When A.L. left Father in approximately late 2020, she left F.M. in his care and did not see F.M. for at least a year. A.L. contended Father prevented her from having contact with F.M. for the first year and thereafter limited her contact with F.M.[5] A.L. claimed she never stopped trying to be in F.M.'s life, but she did not seek custody or visitation orders from the court. Although Father indicated he had full custody of F.M., there was no custody order in place.

---

[4] See *In re T.M.* (Feb. 15, 2019, G056588) [nonpub. opn.] [rejecting Father's appeal of order denying him visitation during pendency of juvenile dependency proceeding]; *In re T.M.* (Oct. 4, 2021, G060012) [nonpub. opn.] [affirming termination of dependency proceeding with exit orders granting full legal and physical custody of children to Father and granting monitored visitation to N.C.]. As explained in *In re T.M., supra,* G060012, N.C. also had a prior dependency proceeding involving her other children (half-siblings of T.M., M.M., L.M., B.M., and W.M.) arising from physical abuse by N.C. directed to one of the children, and her conviction in 2002 for willful cruelty to a child.

[5] The record indicates A.L. resided at some point in Georgia and Father kept F.M. in his care because he was concerned A.L. would take the child out of state.

4

## II.

### REMOVAL, DETENTION, AND PETITION

In February 2023, the Agency received a report Father and his live-in girlfriend were involved in a dispute resulting in domestic violence while the children were home; the children heard but did not witness the incident. During the Agency's initial investigation, the children reported Father had struck M.M., who was then 16 years old, in the presence of the other children. M.M. reported Father became upset and stated he did not want her in the home and called her a "'disrespectful whore.'" Father also called her a "'slut'" and told her to go "'suck a dick, like your mother.'" Father then crushed a cup M.M. was holding against her chest and pushed her against the wall. Father also "smash[ed]" her face before she called the police. According to M.M., this was the first time Father hit her.

Father no longer wanted M.M. in the home and told her to move out. During the incident, Father reportedly told L.M. when a "'bitch gets out of line'" he feels like beating them. Father also had been physically violent with T.M., his oldest son, and had been growing more verbally abusive towards the children.

The Agency also learned Father had been failing to provide for the children's basic needs. The older children were responsible for the housekeeping, cooking, and caring for the younger children. F.M., who was nearly six years old at the time, was not potty trained and was not enrolled in school. M.M. and L.M. were tasked with potty training F.M. The older children reported F.M. was nonverbal.

The paternal grandmother, M.M., and N.C. all reported Father had been diagnosed with bipolar disorder and was not taking his medication, had progressively worsened throughout the years, and was not fit to care for

5

the children. Paternal grandmother also expressed concern with Father's care of the children, claiming he was erratic and angry, and confirmed he had the older children caring for the younger children.

On February 18, 2023, the Agency obtained a protective custody warrant to remove T.M., M.M., L.M., B.M., and W.M. from Father's care. That day, the senior social worker handling the case received over 1,200 text messages from Father. One of Father's texts read: "I'm going to make sure you pay for what you did you stupid fucking bitch. I'm going to destroy you financially morally spiritually. I'm gonna sue you in court. You have a court date you stupid fucking bitch." N.C. also reported receiving threatening text messages from Father, stating she "'is going to die a slow death.'"

F.M. was also removed from Father (and from her mother, A.L., with whom she was not living) pursuant to a protective custody warrant. When the Agency first contacted A.L., she reported she was unemployed and lived with her parents but refused to provide her address or allow the social worker to contact her parents. She denied using drugs and alcohol and having a criminal history. She explained her visits with F.M. were very limited and that Father monitored them. A.L. did not believe Father was caring for the children. When asked about disciplining F.M., A.L. responded she is unable to discipline her because she does not spend enough time with her. A.L. claimed not to know where Father resides. A.L. said she had wanted F.M. to be a part of her life and had contacted the police on several occasions, but they told her there was nothing they could do to help her.

The Agency filed petitions on February 22 and 23, 2023, alleging T.M. and M.M. came within section 300, subdivisions (a), (b)(1), and (c), L.M. came within section 300, subdivisions (a), (b)(1), (c), and (j), B.M. and W.M. came within sections 300, subdivisions (b)(1) and (j), and F.M. came within

6

section 300, subdivisions (b)(1), (g) and (j). The Agency alleged Father physically abused M.M. and T.M.; exposed the minors to domestic violence and substance use; verbally abused M.M.; had an unresolved anger management problem; and had threatened the social worker. The petition also alleged the prior child welfare proceedings.

As to N.C., the petition alleged a history of domestic violence, mental health issues, and a prior criminal history including a conviction or arrest for child cruelty. The initial petition made no allegations as to A.L.

The juvenile court ordered all six children detained from Father on February 23, 2023. The court released T.M., M.M., L.M., B.M., and W.M. to N.C., and F.M. was detained in out-of-home care and not returned to either Father or A.L.[6] Less than three weeks later, N.C. tested positive for marijuana, methamphetamine, and methadone, and T.M., M.M., L.M., B.M., and W.M. were removed from her care and placed in out-of-home care.

The Agency amended the petitions on or about March 16, 2023, after F.M.'s older siblings reported Father had physically abused F.M., had used physical discipline, and had failed to provide sufficient food and obtain basic medical care on her behalf. The Agency's amended petitions alleged Father hit F.M. on the legs leaving marks, there was a history of domestic violence between Father and A.L., Father had a conviction for criminal threats in 2017, Father had been sending hundreds of threatening text messages, the children were exposed to inappropriate sexual content at Father's home, and Father had an unresolved substance abuse problem. The

---

[6] The juvenile court found Father was the presumed father of L.M., B.M., W.M., and F.M.

amended petitions also alleged N.C.'s substance abuse history and recent positive drug tests.

As to F.M., the amended petition alleged A.L. may have unresolved substance abuse issues and mental health issues, and A.L "was aware and/or had reason to know that [Father] has unresolved anger management and mental health issues, and that [Father] had a history of failing to provide for his children's basic needs, and [A.L.] failed to protect the child, [F.M.]" and "did not attempt to obtain custody or visitation with [F.M.]" The amended petition also alleged that, during conversations with the Agency regarding the need to do a home assessment, A.L. stated she did not have "'fucking time to be dealing with this,'" she had things to do, and this was "'bullshit.'"

III.

INITIAL AGENCY INVESTIGATION AND REPORTING

*A. Reporting Regarding A.L.*

N.C. told the Agency A.L. had used methamphetamine and fentanyl. Father sent the social worker a photo of A.L. with what appeared to be a bong in front of her. Father reported A.L. previously used drugs. In her interactions with the Agency, A.L. was aggressive, paranoid, erratic, and concerned for herself.[7] A.L. made multiple statements the Agency viewed as suicidal. A.L. was convinced F.M.'s caregivers were trying to steal F.M., and she screamed at the social worker during conversations about visitation. A.L. sent the social worker numerous profanity-laden, paranoid text messages and yelled on the telephone, used profanity, and hung up on calls. Initially, A.L.

---

[7] For example, A.L. told a social worker she did not want F.M. enrolled in school because it made A.L. "'look bad.'"

8

stated she was stressed and did not want to try to get F.M. back. She appeared to be frequently dysregulated, often having emotional outbursts. A.L. reported a history of anxiety and situational depression.

The Agency requested the court order A.L. to submit to random substance testing. A.L. was hostile and uncooperative with the social worker's efforts to meet with her, and she continued to focus on her own needs and concerns. A.L. consistently visited with F.M. in February and March 2023, but objected to F.M.'s caregivers supervising the visits because A.L. felt they were "'the opposition.'" A.L. was hesitant to attend the visits that had been scheduled. In April, A.L. became upset when she learned F.M.'s caregiver had requested A.L.'s visits with F.M. be supervised at an Agency facility. A.L. began screaming and using profanity at the social worker and stated she refused to do any visits indoors.

B. Reporting Regarding N.C.

N.C. had a history of mental health issues. In 2018, she was placed on an involuntary psychiatric hold. N.C. behaved abnormally, including expressing a belief that some of the children's friends were associated with the FBI, positing the children were vampires, and breaking some of the children's toys. The family court had awarded Father sole custody of the children after the prior dependency case due in part to these behaviors.

After the children were detained, N.C. reported she had consistently participated in mental health treatment for the previous six months and was taking medication as prescribed. N.C.'s psychiatrist reported she was medication compliant and managing her mental illness the best she can. N.C. was diagnosed with ADHD, bipolar disorder, and anxiety. N.C. tested positive for methadone, marijuana, and amphetamines. Two patch tests in March 2023 were both positive for amphetamine and

methamphetamine. Meanwhile, T.M., M.M., and L.M. expressed their love for N.C. and their desire to return to her care.

*C. Reporting Regarding Father*

Father believed N.C. and their oldest son, T.M., had conspired against him. T.M. reported Father had always been erratic and unstable, had narcissistic tendencies, was paranoid and was "'very bipolar.'" T.M. reported Father and his live-in girlfriend would fight all of the time and were both abusive to each other, physically and verbally, in front of the children. T.M. witnessed Father assault his girlfriend. Father told M.M. he had suffocated his girlfriend with a pillow until she lost consciousness.

Father smoked marijuana in the presence of the children, and was reportedly huffing whippets.[8] M.M. reported seeing bongs, torches, and lighters on the table in the home. T.M., M.M., and L.M. had found empty green cannisters all over the home, which they understood to be used for huffing. M.M. found white pills in Father's desk, and each of the older children noted his behavior was bizarre and erratic, including staying up all night and texting the children thousands of messages from the next room. According to M.M., Father once left out a bag of edible gummies, which F.M. tried to eat. Father's girlfriend regularly drank alcohol in the home.

Father did not regularly provide food for the children. M.M. and L.M. were tasked with raising their younger siblings. M.M. had started to

---

[8] "Huffing whippets" commonly refers to inhaling nitrous oxide from small canisters.

attend online school so she could be home, and Father had told M.M. he did not believe in medicine.

Father used excessive physical discipline with the children. He would hit F.M. on the legs when she struggled to speak, causing her to cry. Father also verbally abused the children and made comments about the two older girls' bodies. Father would call M.M. a whore and tell her to "'go suck a dick and sell your pussy,'" and would often say "'weird things like wanting to test if she is still a virgin.'" Father had commented on both L.M.'s and M.M.'s breasts. L.M. reported Father was "'obsessed with people's sex lives'" and said "'inappropriate sexual things.'" When L.M. came out as gay, Father made inappropriate comments and went into detail about sexual acts. Father was also violent towards their dog.

Father's interaction with the Agency was volatile, erratic, and paranoid. He would send the social worker hundreds of text messages each day, including texts, pictures and videos of naked women and of his children, and references to his various businesses and wealth. Father frequently remarked N.C. was conspiring with the older children against him. Father was aggressive towards staff at a drug testing site and called the test observer a "'faggot'" because he watched Father's urine collection. The Agency obtained an order from the juvenile court limiting Father's communication with the social worker to one e-mail a day as a result of his behavior.

IV.

JURISDICTION AND DISPOSITION

The jurisdictional hearing took place on April 24, May 1, and 2, 2023. On May 2, 2023, the juvenile court found the allegations of the amended petition true, bringing the children within the definitions of section 300, subdivisions (a), (b)(1), (c), and (j). The court found vesting custody with

11

Father would be detrimental to the children and vesting custody with the Agency was necessary to serve their best interest. The court further found, pursuant to section 361.2, subdivision (a), that placement with N.C. or A.L., with whom none of the children was residing when the events that led to the proceedings occurred, also would be detrimental. The court adopted the case plan and visitation plan set forth in the Agency's March 16, 2023 report. Petitioners were offered family reunification services, and the court encouraged the children to participate in visitation.

B.M. and W.M. were placed together in a new foster home, and F.M. was placed with her maternal grandparents.

V.

INITIAL REUNIFICATION PERIOD AND
COMBINED SIX/12 MONTH REVIEW HEARING

A. *First 12 Months of Reunification Services*

1. A.L.

A.L. was offered and engaged in parenting education, individual counseling, and visitation.

In August 2023, A.L.'s therapist reported attendance problems, as A.L. often missed or was late to therapy sessions. A.L. often went on tangents during sessions, needed redirection, and became upset and shut down when questioned. The termination report from A.L.'s therapist noted further progress was needed on communication, domestic violence insight, self-esteem, and insight as to why the Agency had intervened.

The juvenile court authorized funding for substance testing for A.L. in April 2023, and she was referred for testing. Substance testing was not, however, included as a service in the case plan for A.L., and A.L. refused to voluntarily test. Later that month, the Agency asked the court to amend

A.L.'s case plan to reflect a substance testing requirement, as her sobriety was a reunification concern. The court denied the request. A.L. declined to participate in random substance testing and did not appear for any testing, despite being informed her sobriety was a concern and testing was available. In addition, from May through August 2023, A.L. struggled to begin parenting education. The social worker attempted to assist A.L. in enrolling in a different course at A.L.'s request, but A.L. was not responsive. Meanwhile, A.L. was mostly attentive during visits with F.M. and the visits were largely positive. A.L. was observed, however, to respond negatively to F.M. when A.L. was upset.

In December 2023, A.L. refused to sign a new counseling referral form, insisting the statements in it (which had been obtained from the sustained petition) were false. A.L. preferred to sign a release of information from her personal therapist rather than reenroll in Agency-provided therapy sessions. In November 2023, A.L.'s friend, Martha, agreed to undergo a background check so she could be assessed as a potential visitation supervisor. From December 2023 to February 2024, A.L. was scheduled for three supervised hours with F.M. on Fridays at a local park and three supervised hours on Saturday at a visitation center. A.L. attended visits inconsistently and often was late or missed visits. F.M. reported it would make her happy to live with her mother again, but she did not want to do so yet, but would at some point.

In late January 2024, A.L. reported she would no longer attend visits at the visitation center. Meanwhile, F.M. reported being confused and sad as to why she was not living with A.L. and said she missed living with her. In early February, the visitation center cancelled A.L.'s referral due to no-shows. A.L. did not cooperate with the social worker's early attempts to

13

schedule an in-person meeting between them for January 2024. A.L. met with the social worker in person later that month but was late for the meeting and was observed to be agitated and fidgety, exhibiting jittery speech and an inability to maintain eye contact. At the time of the social worker's visit, A.L. was residing with Martha, and the home was observed to be cluttered and had a foul odor.

The juvenile court ordered the Agency to assess Martha again as a visit supervisor. A.L. expressed her belief that her mother (F.M.'s caregiver) was intentionally sabotaging A.L. and trying to steal F.M. The social worker discussed visitation with the maternal grandmother, who expressed frustration about A.L.'s visits and said she was not on good terms with A.L. The Agency reported to the court it was unable to alleviate its concern about A.L.'s potential substance abuse due to the lack of required testing.

In early March 2024, after A.L. and the social worker exchanged e-mails about A.L.'s lack of responsiveness, A.L. again failed to respond to the social worker's efforts to schedule a meeting for that month. A.L. also continued to arrive late to visits. On March 15, 2024, A.L. became angry and yelled at the social worker in front of F.M., leading the social worker to terminate the visit. A.L. stated she wanted the visitation arrangement to change, but she did not follow up regarding this request.

A.L. attended a child and family team meeting in April 2024. A.L. again requested Martha be approved to supervise the visits. The Agency agreed to submit a new visitation referral for A.L. to have supervised visits for three hours on Saturdays. On April 12, 2024, the social worker sent A.L. a message stating she had coordinated with F.M.'s caregiver to be available for video calls twice a week; A.L. would be expected to initiate the calls; and A.L. and F.M. also would have Friday visits supervised at a park. A.L. did not

14

reply to this message, and the social worker followed up again later that month. The social worker submitted a new visitation referral to reinstate the final three hours per week of visitation. On May 7, 2024, F.M.'s caregiver reported A.L. had not called to initiate video conference meetings with F.M.

A.L. stated she preferred to sign a release of information for her personal therapist rather than reenroll in Agency-provided therapy sessions. But she failed to sign the required release of information form. Instead, she provided the Agency a letter purporting to be from her therapy provider. The Agency contacted the provider to confirm the information provided by A.L. The provider responded they "'have no record or knowledge of this patient'" and confirmed the letter was a forgery, stating it was "'not written by [the provider].'"

2. N.C.

N.C. was offered and engaged in drug testing, individual counseling, psychiatric services, visitation, parenting education, a 12-step program, and substance use outpatient treatment.

N.C.'s counseling provider noted she demonstrated good insight and was making progress. N.C. completed her first round of counseling in August 2023 and achieved several of her therapy goals. The therapist reported, however, that N.C. needed ongoing, long-term therapy to work on controlling her impulses and reactions. Meanwhile, N.C. tested positive for amphetamine, cocaine, and methamphetamine during the summer of 2023. The Agency informed N.C. she would need to repeat a program she completed in April 2023 because she continued to test positive. In October 2023, the caregiver for two of N.C.'s children received a text message from N.C. that referenced cocaine use. Although N.C. had enrolled in parenting education,

15

she failed to regularly attend courses, and her referral was terminated in May 2023.

In June 2023, the visitation referral was resubmitted for the full 10 hours per week N.C. had been ordered, but the visitation center could only accommodate nine of the 10 hours. The children reported enjoying their visits with N.C. A new visitation schedule was required when the children began school in August, and that schedule provided for only six hours per week. The visitation referral was terminated after N.C. cancelled three visits in a row. In October, N.C. declined four hours of visits available to her at a visitation center in Santa Ana. W.M.'s foster mother reported N.C.'s contacts were inconsistent, N.C. did not keep promises she made to W.M., and N.C. had sent inappropriate messages to her.

On October 18, 2023, the Agency received a child abuse report alleging N.C. sent e-mail with pornographic content to three of her children, including B.M. Also in October, N.C. made several phone calls to the social worker and a caregiver that were nonsensical and incoherent, and L.M. and M.M. shared with a social worker screenshots of hostile text messages they had received from N.C.

In November 2023, N.C. was psychiatrically hospitalized. She began a new medication regimen and was placed on probation relating to possible arson charges.

In January and February 2024, N.C. was offered visitation times at a visitation center but declined to participate. Through February 2024, B.M. and W.M. continued speaking with N.C. regularly by telephone and attended a few supervised in-person visits. On February 28, 2024, the social worker contacted the visitation center to create a schedule, with five-and-a-

16

half hours per week made available at the visitation center, but N.C. declined some of the hours offered.

N.C. tested positive for methamphetamine in late February 2024, but insisted the results were a lab error. She continued to attend 12-step meetings through April 2024 but did not re-enroll in a substance abuse treatment program.

By March 2024, N.C. was speaking with B.M. and W.M. over the telephone approximately once a week. N.C. began her weekly supervised visits with the boys and her older children in late March 2024. In mid-April 2024, N.C. reported she would need to change the visitation schedule due to an employment conflict. In April, B.M. and W.M. began visiting with N.C. on a different day that accommodated N.C.'s work schedule, with no concerns noted.

3. Father

In the first 12 months following disposition, Father was offered and engaged in drug testing, individual therapy (including counseling on domestic violence), visitation, a parenting education course, 12-step meetings, and family counseling with B.M. and W.M.

Father's therapist noted Father repeatedly spoke at length and off-topic and continued to speak negatively about two of his older children. Father continued to behave in an erratic and antagonistic manner and continued sending excessive messages and e-mail despite a court order limiting such communications.

In June 2023, B.M. and W.M. expressed they would feel comfortable attending visits with Father only if all the siblings attended. Father wanted to see the boys but objected to L.M. and M.M. being present. Father told the social worker he would "'not be part of their life if they have

17

contact with their mother [N.C.]. I don't want to be around a bunch of liars that hang out with a whore. I'm not going to co-parent with her. I'm willing to cut off my kids.'" W.M. attended a visit with Father and F.M. in July but was quiet and responded minimally to Father. B.M. and W.M. declined to visit with Father from July to October 2023 despite the social worker's regular encouragement. The social worker submitted a referral for monitored phone calls to be facilitated between Father, B.M., and W.M. twice a week. Father sent inappropriate text messages and pictures to L.M., including nude photographs of his then-fiancée. L.M. expressed intense disdain for Father. Father attended monitored visits with F.M. and behaved appropriately. Father tested positive twice for marijuana.

Father completed individual counseling in October 2023. Father's drug testing results were all negative from late 2023 to early 2024. B.M. and W.M. declined visitation with Father through February 2024, including monitored phone calls. The social worker attempted to encourage their participation at each scheduled call time. On one occasion, Father responded to news of the boys' refusal with a series of disparaging text messages about the children and N.C. The social worker suggested to B.M. in November 2023 that conjoint therapy with Father might provide an opportunity for them to talk and share difficult emotions, but B.M. declined to participate.

On November 27, 2023, Father sent the same e-mail to the social worker six times describing how B.M. and W.M. were being brainwashed. In mid-November 2023, B.M. and W.M. began family therapy with Father. After the first session, both boys indicated they did not like interacting with Father and did not feel the session was productive. The boys continued to state they did not want to participate. Meanwhile, Father continued to behave in an erratic and antagonistic manner, continuing to send excessive and seemingly

18

random text messages and e-mails complaining about the Agency and N.C. Father also continued to share inappropriate comments with L.M. and M.M. and failed to take accountability for his inadequate care of the children, blaming the older children for neglecting F.M. and blaming N.C., who he called a "'dumb bitch'" and a stalker. Father disparaged the boys' caregivers, criticizing their decision to feed the boys avocado toast, referring to it as "'stupid faggy shit.'"

By January 2024, both B.M. and W.M. expressed they wanted to stay with their caregivers long-term and referred to them as "'mom'" and "'dad.'" B.M. and W.M. declined visits with Father in March and April 2024, despite the social worker's encouragement they participate. Father continued visiting with F.M. with no concerns noted. On May 7, 2024, B.M., W.M., F.M., and two of the other children attended a joint visit with Father. Father continued to send excessive and inappropriate messages to the Agency. Both B.M. and W.M. stated they wanted to be adopted by their caregivers.

B. *Combined Six- and 12-Month Review Hearing*

The combined six- and 12-month review hearing took place on May 14, 2024, during which each of the three petitioners stipulated—and the juvenile court found—reasonable services had been provided up to that point and services would continue to the 18-month review hearing. Each of the three petitioners also submitted on the court's finding that returning the children to them at that juncture would create a substantial risk of detriment. The court continued the matter to August 19, 2024, for an 18-month review hearing.

## VI.

### REUNIFICATION PERIOD LEADING UP TO 18-MONTH REVIEW HEARING

*A. A.L.*

In May 2024, A.L. visited with F.M. and reported no issues being able to talk to F.M. over the phone daily. A.L. did not, however, make herself available for a monthly compliance meeting in May with the social worker, insisting her attorney be present. A.L. also stated she wanted her visitation monitor changed. The court ordered the Agency to investigate A.L.'s request that a non-Agency monitor be approved.

A.L. began individual therapy with a new provider and reported sessions were going well. In July 2024, A.L.'s therapist noted A.L. believed the Agency was the enemy and denied any substance abuse or mental health issues. Meanwhile, the Agency continued to note that "due to the lack of required substance abuse testing, the agency is unable to alleviate the concern that substance abuse may be a factor in [A.L.]'s behavior." The social worker periodically reminded A.L. testing was available so she could demonstrate her sobriety and encouraged A.L. to participate in testing. Earlier in the year, A.L. was charged with shoplifting, and had been with a man the Agency suspected was her boyfriend when he was arrested for felony drug and weapons offenses. A.L. minimized her relationship with the man. A.L. also denied he was present at visits with F.M., a claim that was contradicted by F.M.'s caregiver.

A.L. did not make herself available for monthly meetings with the social worker from September to December 2024. The social worker made A.L. aware these meetings were important to the Agency's ability to assess the potential for more liberalized visits. A.L. cancelled the December monthly meeting rather than attend without her therapist. The Agency resubmitted

20

A.L.'s therapy referral. In mid-December, A.L.'s therapist noted A.L. had achieved her therapy goals and had been educated on how the Agency might view her inconsistent communication given the patterns often shown by substance users. The therapist noted there would be no further concerns so long as A.L. does not return to self-medicating with substances or entering unhealthy relationships. The therapist noted if A.L. was okay working with the Agency and does not disappear, there would be no further work to address in therapy regarding the Agency's ongoing concern that A.L. had shown patterns often attributable to substance users.

A.L.'s in-person visitation with F.M. continued through late 2024. A.L. visited with F.M. six hours per week in June and July 2024 but was scheduled for nine hours per week over the summer break. A.L. had brought the man suspected to be her boyfriend with her to a visit in mid-June, and F.M.'s caregiver suspected both A.L. and the man were under the influence of drugs; they both wore sunglasses indoors throughout the visit. The visitation schedule was updated in July 2024, switching one of the weekday visits from Wednesday to Tuesday. When A.L. learned of the change, she said she could not attend on Tuesdays. The social worker asked whether she could attend on Tuesdays just for the next two weeks, at which point the schedule would change again due to F.M. starting school. A.L. did not respond for several days. The social worker submitted a new visitation referral that would accommodate both A.L.'s and F.M.'s schedules.

On August 28, 2024, A.L. had an outburst in front of F.M. directed to F.M.'s caregiver and the visitation monitor. A.L. was calling F.M. regularly in the evenings, but sometimes called too close to bedtime, which led the caregiver to cancel the call. In September, the visitation program coordinator tried regularly to reach A.L. and add more hours to her visits, but

21

could not reach A.L. The social worker assisted in connecting them, but A.L. told the visitation program coordinator she did not want the visits to take place at the visitation center. The social worker encouraged A.L. to accept the hours that were available. F.M. indicated she wanted to live with her grandmother but was aware her parents wanted her to live with them. In October, A.L. failed to regularly speak with F.M. over the phone.

On November 4, 2024, A.L. filed a modification petition asking the court to return F.M. to her care and terminate the case. She included several attachments, including a one-page letter regarding a psychological evaluation of A.L., screenshots of what appeared to be text messages with F.M.'s caregiver, and documents relating to the assessment of Martha as a visitation supervisor. The court set the hearing on the modification petition to coincide with the final review hearing.

On November 5, 2024, the social worker spoke with F.M.'s caregiver about A.L.'s missed telephone calls with F.M., and they agreed upon a schedule with telephone calls on Wednesdays, Thursdays, and Sundays. The social worker instructed the caregiver to provide a weekly call log of the video contacts and told her not to interfere with the calls. A.L. expressed she was not comfortable initiating the calls, so the social worker coordinated with the caregiver to initiate the calls on Thursdays. A.L. stated she was always available to speak to F.M. and that she would file contempt charges against the social worker. The social worker resubmitted the visitation referral in November 2024, as A.L. had apparently failed to accept the available hours. The caregiver reported that, on numerous occasions, A.L. did not answer calls from the caregiver at the scheduled times; she also noted A.L. often appeared "'strung out'" and said she did not want F.M. to see that.

A.L.'s suspected boyfriend was present at multiple visits in late 2024 and, according to F.M.'s caregiver, appeared to be under the influence of drugs.

F.M.'s caregiver also expressed several concerns about A.L.'s circumstances in January 2025, including that A.L. appeared "'strung out'" during a recent video call with F.M., and Martha was enabling A.L.'s substance use and should have noticed that A.L. and the alleged boyfriend were likely on drugs. A.L. and Martha met in person with the social worker in February and March 2025 for a home assessment and monthly compliance meeting. They discussed A.L.'s request that Martha be approved as a visitation supervisor, and A.L. explained she did not want to have to ask Martha to supervise her visits because she believed they should have been liberalized already. A.L. also declined to sign a release for her psychological evaluation, saying she did not need to do so because the evaluation had been voluntary. A.L. later told the social worker she had decided she did want Martha to supervise visits.

*B. N.C.*

In May 2024, N.C. continued having weekly visits with B.M. and W.M. She asked whether her visitation could be liberalized to include unsupervised in-person visits, and the social worker informed her the Agency was looking for more progress with patch testing (for drug use) and consistency with her supervised visits. Toward the end of May, B.M. and W.M. cancelled a visit with N.C., and the caregiver had to intervene when N.C. became upset. In early June 2024, B.M. and W.M. declined another visit. In October 2024, the social worker helped connect N.C. with a therapy provider after her psychiatrist recommended she resume counseling, and N.C. thereafter actively engaged in her counseling services.

In June and July 2024, B.M. and W.M. attended multiple visits with N.C., but also cancelled several. In late July, the visitation referral was terminated due to excessive cancellations. The social worker coordinated with the caregivers to supervise at least one visit per month while a new referral was pending. A new referral was submitted in August, while B.M. and W.M. expressed they liked the once-a-month visit schedule and did not want to attend weekly visits. In September, N.C. reportedly guilted B.M. and W.M. into attending a make-up visit, which caused B.M. to become stressed. Meanwhile, W.M. knew his prospective adoptive parents would control visits with N.C. if he were adopted and said he felt things were "'good and stable'" with his caregivers. W.M. stated if he were adopted, he would want to see N.C. "'once a year.'"

In November, B.M. and W.M. had weekly visits scheduled with N.C. B.M. did not mind the idea of M.M. supervising visits, but did not want it to change anything about his case. B.M. commented he did not like the new visitation center.

In early January 2025, N.C. was approved to have a supervised visit with B.M. and W.M. at her home. In January and February, B.M. and W.M. attended visits with N.C. only a couple of times. In March 2025, N.C. and Father began attending the boys' football games. B.M. told the social worker he did not want to hurt N.C.'s feelings, but he did not want her to attend his games. N.C. had told B.M. if he would attend visits with her, she would not go to his football games, which he felt was unfair. The social worker reminded the boys of N.C.'s weekly scheduled visit and encouraged them to attend the visits more frequently.

In August 2024, the social worker spoke with B.M. and W.M. about their openness to conjoint counseling with N.C. Both boys said they did

not want to participate. A referral for family counseling was nevertheless submitted, and the family was added to a waitlist. When the social worker checked in about the referral in late November, N.C. reported she had not yet contacted the provider to whom she had been referred for family counseling. By early December, an intake appointment had been scheduled between N.C. and a therapist. B.M. and W.M. refused to attend therapy and continued to express they did not think it would be beneficial.

C. *Father*

Father continued to send L.M. inappropriate text messages. Father also sent the social worker dozens of messages in one day, including links to social media posts, real estate photos, and old pictures of the children.

B.M. and W.M. refused visits with Father in May 2024, but told the social worker they were thinking about attending weekly visits. They were concerned the court would think they wanted to live with Father if they attended visits with him. The social worker encouraged them to attend visits. F.M. continued visiting with Father as scheduled.

In May 2024, the social worker received several e-mails from Father explaining his belief the children were being given incentives to lie about him. M.M. also reported receiving odd and inappropriate texts from Father in July 2024, and she shared them with the social worker. Both M.M. and L.M. continued to receive excessive messages from Father and found them to be manipulative and distressing. Father continued to send excessive and unusual messages to the social worker stating N.C. had orchestrated the events that led to the child welfare proceedings. During several meetings, Father went on tangents and often required redirection.

In November, Father sent an excessive number of text messages to the caregivers of B.M. and W.M., ranting about N.C., A.L., and T.M. conspiring against him. Father was dismissive of the social worker's suggestions that he engage in more positive communication with and in front of the children. Father was displeased at the news L.M. wanted to live with N.C. He believed N.C. would return to substance abuse.

Father continued testing negative for all substances and attended 12-step meetings. The Agency made family therapy referrals starting in May 2024. The summary termination report from prior family counseling noted Father had limited insight into how his behavior had contributed to the children's removal and that it was "unclear whether [F]ather and children will be able to improve the communication between them if [F]ather is unable to utilize positive praise, active listening, and overall positive communication skills with children." A family counseling referral was resubmitted and, on August 8, 2024, the social worker informed Father he could begin the intake process to resume sessions. B.M. and W.M., however, were adamant they did not want to attend, and the referral expired in September. A new referral was submitted in October.

In June 2024, all the children attended a visit together with Father. Father's visitation with F.M. remained consistent. B.M. and W.M. attended several visits with Father and reported no concerns, but they were not interested in visits being unsupervised or increasing in number. The court-appointed special advocates for B.M. and W.M. noted they were doing well in placement. B.M. did not want to visit with Father, and W.M. was clear about not wanting to return to his parents' care. Beginning in August 2024, both B.M. and W.M. declined to visit or speak on the phone with Father, despite regular prompting by the social worker and their caregiver.

26

B.M. and W.M. consistently maintained they felt safe with their caregivers and wanted to remain in their care.

From August 2024 through end of September 2024, Father continued to send the social worker hundreds of text messages, including repetitive pictures, documents, and links. Father required redirection, and he continued to make disparaging and racist comments and blame others for the dependency case.

VII.

FINAL REVIEW HEARING

The final review hearing began on January 21, 2025. The juvenile court received into evidence the Agency's reports and heard testimony from L.M., B.M., W.M., F.M., N.C., A.L., Father, and the social worker.

A. *F.M.'s Testimony*

F.M. testified she liked living with her current caregivers. She testified she had also been happy living with Father and A.L. She felt Father protected her and she was safe with him. F.M. testified she would want to live with Father but had not told anyone because her grandparents wanted her to live with them.

F.M. testified she currently visited with A.L. and enjoyed her visits. She was happy with A.L. and believed A.L. took good care of her. She missed A.L. while she was living with her grandparents. She wished she could have more visits with A.L., but did not know whether she would want to see her every day.

B. *B.M.'s Testimony*

B.M. testified he had recently visited N.C. and his siblings over the holidays and had a nice time. He enjoyed visiting with N.C. every once and a while. B.M. was not afraid of N.C. and texted and called her multiple

27

times a week. But B.M. wanted to be adopted and would be fine not seeing or contacting N.C. or his siblings anymore if it meant he was being adopted. B.M. did not remember living with N.C. other than the month he lived with her at the outset of the underlying proceedings in early 2023. B.M. wanted to be adopted because he loved his current home and family. B.M. had not gone to conjoint counseling with N.C. because he did not feel he needed it and did not want to go. He was happy with his life with the caregivers. B.M. said he would attend conjoint counseling if he was told he had to do so, but he thought it would be a waste of time.

B.M. had not been visiting with Father because he did not want to. He did not like the way they had lived when they lived with Father. Father yelled a lot and called members of the family names. B.M. cried while he was testifying about Father. He was afraid of Father because of the way he saw Father treat his older siblings, and did not wish to live with or see Father. B.M. had not seen Father in more than six months. B.M. stopped visiting Father because he had decided he wanted to be adopted.

B.M. understood what adoption meant and understood that, if adopted, his adoptive parents would control whether he could see N.C. and Father going forward. B.M. had discussed adoption with his brother, W.M., and they agreed they wanted to be adopted.

C. W.M.'s Testimony

W.M. enjoyed texting and calling N.C. and his older brother, T.M. Like B.M., W.M. wanted to be adopted. He enjoyed seeing his siblings and N.C. but would be okay not seeing them anymore if it meant he could be adopted. The placement was safe and stable.

W.M. also had not attended conjoint counseling with N.C., even though it had been offered to him. He felt it would not have been a good use

28

of time. He testified his relationship with N.C. was fine and they did not have anything to work on, but he wanted to stay with his current caregivers. W.M. also did not remember living with N.C. aside from the month he lived with her in early 2023.

W.M. did not see Father often and did not want to visit with him. He was not afraid of Father but felt uncomfortable around him and did not enjoy visiting with him. W.M. did not have Father's phone number and did not want it.

*D. Interim Proceedings and Motions*

After W.M.'s testimony, the hearing was continued several times. During one hiatus, on March 13, 2025, in response to a request by N.C. that the court take steps to ensure the ordered visitation with B.M. and W.M. occurred, the court addressed N.C.'s visits with B.M. and W.M. The court "recognize[d] the Agency's policy of not forcing children to go on visits. Obviously, they are 11 and 13, and they can state what they want to do." The court ordered the Agency to encourage the caregivers to keep visitation days relatively clear of other activities and convey to them the court-ordered nature of contacts. The court also ordered N.C. and Father be allowed to attend the boys' games.[9] The court stressed that it "be made very clear, obviously, the policy of the Agency is, obviously, don't force these kids to go on visits, you know, but, like I said, I'm hoping if you take away all the extra fun, maybe they'll be more likely to go."[10]

---

[9] The court later modified its order to allow contact with the children at their games only if initiated by the children.

[10] In referring to "all the extra fun," it appears the court was referring to testimony regarding the boys' weekend visits to the beach.

The court noted that only one of the boys was participating in counseling services and stated, "[s]o, to me, you know, I would hope that the individual counseling they would jump into conjoint, but, like I said, I'm not going to force that, you know. [¶] I would like them to consider it, you know. But at the same time, I understand that these are teenagers, and the more we push, the more we force, the more they're going to run the opposite way."

*E. N.C.'s Testimony*

N.C. testified her individual counseling was going well, but she wished B.M. and W.M. could attend counseling with her. N.C. had spoken with the social worker about conjoint counseling, and the social worker had discussed the possibility with the boys. N.C. had been visiting with the boys about once a month. Although she was ordered to have 10 hours of visitation with them per week, N.C. believed they only attended visits once a month because the boys disliked the visitation center where the visits were required to take place. N.C. had spoken with the social worker about approving a supervisor who could accommodate visitation with the boys at N.C.'s house, but no specific individuals were available and approved.

On two occasions, B.M. told N.C. he did not wish to reunify with her. She agreed they were stable and thriving with their current caregivers and it would be better to give the boys time and return them to her care more slowly. If the decision, however, was between returning them to her care immediately or not at all, she would have them immediately returned to her despite their objections.

*F. A.L.'s Testimony*

A.L. testified she had completed two parenting courses and had learned to be a well-rounded parent. She wanted F.M. returned to her custody. A.L. had not signed a release that would have made it possible for

the Agency to confirm she had completed a psychological evaluation because it was not a court-ordered evaluation.

A.L. testified she had been consistent with her visitation and had tried to communicate with the visitation center. A.L. did not think the visitation center was conducive to positive visitation with F.M. She had experienced conflict with other individuals there and told the social worker she would not go back. A.L. testified that "[b]eing around gang members isn't very fun." A.L. testified about her prior request in 2023 that Martha be approved to supervise visits. A.L. followed up with the social worker multiple times about this request, but to her knowledge, Martha was not assessed. The social worker told A.L. the week before the final review hearing Martha could "'probably'" be approved to supervise some visits. But the social worker had told A.L. she did not believe Martha was a good option. Martha had previously served as a foster parent. A.L. believed that, had Martha been approved earlier in the case, her visitation with F.M. would have been more comfortable.

Visits had not been allowed to take place at the home A.L. shared with Martha, and A.L. testified she never got the full number of visitation hours she was ordered. On one occasion, her visits had been rescheduled to a day she could not attend, and the situation was not corrected. At the time of the hearing, A.L.'s visits were being supervised at a well-known children's pizza restaurant and other places out in the community and had been occurring in this manner for about six months. F.M. was happy and engaged during visits.

A.L. testified she did not have a drug problem and denied being asked by the social worker to drug test. A.L. had been ordered into and completed counseling and parenting services. A.L. felt the senior social

31

worker assigned to the case had been absent and difficult to contact. A.L. had felt uncomfortable with the social worker in person because she felt she was being belittled, so she had requested both her therapist and her lawyer be present during monthly meetings. A.L. also asked that the social worker's supervisor be present during meetings, but that never occurred. Several meetings had been scheduled but were later cancelled by the social worker. A.L. wanted the supervisor present because she believed her case was not being handled properly. Because of her situation and "who [she was]," A.L. felt she should have been allowed more privileges, and F.M. should have been returned to her. Her therapist was not allowed to attend a meeting because the referral expired and needed to be renewed.

A.L. started sessions with her current therapist as a teenager, and the Agency facilitated a referral to that therapist at A.L.'s request. A.L. felt she had come a long way in reflecting on her inadequacies through therapy.

A.L. did not agree with F.M.'s placement with the maternal grandmother, who A.L. felt undermined reunification. A.L. believed her mother tried to get the social worker and visitation monitors to believe false things about A.L., which caused them to write adverse reports. The maternal grandmother drove F.M. to and from visits and tried to stay throughout the visits until she was instructed to leave. A.L. had telephone visits with F.M. early in the case, but the maternal grandmother had stopped allowing F.M. to speak with A.L. by phone. The social worker had spoken with the maternal grandmother about interfering with the calls. The maternal grandmother reported A.L. showed up to visits late. A.L. testified the last time she was late for a visit was about six months prior, but she could not recall when the

maternal grandmother had last reported claimed tardiness to the social worker.

*G. Father's Testimony*

Father testified he had not read the Agency's reports because he found them insulting and disagreed with the Agency's recommendation. Father felt the dependency process had not instilled good values in his children, as he had seen his son T.M. be "handed a free ride by the State as an incentive to continue the process." Father gave several nonresponsive answers regarding the impact of the dependency process on his family. Father believed his case came before the court because a prior judge had failed his family by ordering visitation for N.C. He felt that by being awarded sole custody, he lost the benefits of having two households where he could "drop the children off and enjoy the weekend without being a parent." The children "were always forced to grow up quickly because they grew up without a second parent."

Father testified "[t]here were a few years where my children disappeared. From what I understand, their social security numbers were changed, and I was not able to locate my children for about three years. Then one day they were handed to me as a result of an arrest." Father testified the children had run to the field across the street from the apartment where they were living because their mother was wiping menstrual blood on the walls. Father did not try to contact the children during this period, but he knew where they were because he paid their rent.

Father had not allowed the children to see N.C. because he believed a previous judge had told him not to allow any such contact. He believed N.C. was permitted monitored visitation, but he was never contacted about visitation. Father did not believe the neglect allegations were true

33

because he had never been better off financially. When the children resided with him, he got food stamps and money from the paternal grandmother, so the family had filet mignon and lobster. The children had gotten lazy and had food delivered to them from N.C. because they did not want to do dishes.

Father had a very large project in Maui that took up all his resources. The children had been taken from him because he had tried to protect them by calling the police after T.M. beat up one of the girls. He put the video of T.M. beating up his sister on social media so T.M.'s girlfriends would know he beats up women.

Father claimed to not believe in corporal punishment but had tossed T.M. "like a toothpick" when he was on top of one of the girls, and another time N.C. had asked him to beat T.M. so Father pretended to hit him.

Father had been diagnosed with adjustment disorder, which he explained means he must remove himself from problems. Father had been diagnosed with depression in the past but denied being bipolar.

Father did not believe he had ever sent any inappropriate texts to L.M. He believed B.M. and W.M. were being encouraged not to come home by T.M. Father believed the boys were indoctrinated not to communicate with him and they had been brainwashed. He had not visited with B.M. and W.M. because they do not talk to him, but he had been going to their football games.

Father testified visits with F.M. went very well, and she cried when they ended. When asked whether he believed F.M. could safely be returned to A.L., he said he believed they would do well sharing custody. He provided a similar response when asked whether the other children could be

returned to N.C. Father believed the social worker had been helping him and doing the best she could under the circumstances.

*H. Social Worker's Testimony*

The senior social worker had been assigned to the case since September 2023. Although Father had been compliant with the requirements of his case plan, he had not applied the skills and information he had learned in services. Instead, Father continued to blame others for his children's removal. Father struggled to articulate how he could apply what he learned in services, and he continued to express his belief the Agency's involvement was an orchestrated event against him.

Father did not understand the role his own actions had played in the children's removal and was unable to regulate his emotions around the children. He had consistently visited with his children, but B.M. and W.M. refused to visit with him, regardless of location or supervision level, and did not want to reunify with him. The social worker had spoken with the boys at each compliance visit about what could be done to make them feel more comfortable with the idea of visiting with Father. She offered to supervise visits herself and offered telephonic visitation as an option, but each time they declined. "We can tell them what visitation is available to them and encourage them to go, ask them what we can do to make it better for them, all of which I have done on a monthly basis. They continue to tell me 'No' and continue to decline any offers. I can't make them get in the car and go." Both B.M. and W.M. told the social worker they did not wish to have their visitation liberalized with either Father or N.C. because they did not feel comfortable and did not want to reunify with them.

F.M.'s visits with Father were largely positive, but they were not liberalized to unsupervised because of Father's behavior. Father continued to

35

communicate with the older children in inappropriate ways. Father was dismissive of the social worker's efforts to discuss the impact these conversations might be having on the children. The family had briefly participated in family therapy, but the therapist assigned to the family left the agency and the case had to be reassigned. By the time it was reassigned, the children were refusing to participate. The termination report for the referral noted Father lacked insight into the reasons the family was involved with the Agency.

N.C. had been compliant with her case plan. Although N.C. and Father had some unhealthy communication during the reporting period, N.C. had been open to discussing it with the social worker. N.C. had requested M.M. be approved to supervise visits with the other children. Although the Agency had assessed M.M. for that role, there was a concern she would not be able to be neutral between N.C. and M.M.'s siblings. The social worker testified B.M. and W.M. could not safely be returned to N.C.'s care. "They have had little to no exposure to what [N.C.]'s mental health looks like when it is declining, and I am concerned that they would not be able to recognize those warning signs and symptoms before [her] behavior would become dangerous or disabling if she were to have another mental health episode." W.M. and B.M. had refused to participate in conjoint sessions because they did not want to reunify.

The social worker had encouraged the boys on multiple occasions to participate in the counseling and visitation that was being offered, but despite her encouragement, both consistently refused to participate. She discussed the boys' feelings about N.C. and why they did not want to visit with her, despite having no bad things to say about their relationship with her. B.M. and W.M. visited with N.C. only monthly, despite additional

visitation hours having been ordered. She regularly reminded them additional visits were available to them. The boys had told the social worker they preferred a different visitation center for their monthly visit, but she testified she did not believe that was what was preventing them from attending more regularly. She explained she would eventually get them back to their preferred center with the next set of referrals. The full number of hours of court-ordered visitation was not available at the visitation center because the referrals were terminated due to the boys' failure to attend.

The social worker testified A.L. had completed the services in her case plan but had failed to apply the skills and information she had learned. She became concerned A.L. was struggling with substance abuse in October 2023. She had received reports about her history with substance use and had observed A.L. at a meeting to be fidgety and easily agitated; A.L. had left the meeting prior to its normal conclusion. A.L.'s therapist had noted a concern that she would struggle to reunify if she was not sober. The maternal grandmother reported Martha was enabling A.L.'s substance use. The juvenile court denied the Agency's request for drug testing, and A.L. denied the Agency's requests that she voluntarily test in July and August 2024 and March 2025.

Although A.L.'s case plan did not include a psychological evaluation, A.L. submitted a letter indicating she had undergone one voluntarily. A.L., however, refused to sign a release to allow the Agency to verify the records provided and ensure that a real psychological evaluation had been performed. A.L. did participate in individual therapy, and the therapist did not note any unresolved mental health issues. The therapist had reported that "if [A.L.] was not having any issues working with the Agency, there would be no reason for her to continue therapy services."

Although A.L. had completed her case plan services, the social worker still considered A.L.'s progress to be minimal because she had not been meeting with the Agency for monthly compliance visits up until February 2025.

A.L.'s visits with F.M. were largely positive, and A.L.'s consistency with visitation had improved following a child and family team meeting in April 2024. In the summer of 2024, A.L.'s visitation was occurring regularly, but the social worker had changed one of the visitation days at the request of the caregiver, who was concerned about F.M.'s schedule. The change was abrupt due to the availability of a supervisor, and A.L. was not consulted regarding the change. A.L. had not made the social worker aware of any employment or other conflicts that would be a barrier to her participation in these visits. When the social worker learned this change would not work for A.L.'s schedule, she worked out a new plan and submitted a new referral to adjust the schedule. A referral for the full allotted amount was submitted, but during the summer of 2024, A.L. was not getting the full number of hours that had been ordered by the court due to scheduling issues with the visitation center.[11]

The center had difficulties reaching A.L. in August 2024 despite multiple attempts, at which point the social worker reached out to A.L. to encourage her to respond to the visitation center. When A.L. finally contacted the visitation center, A.L. told them she did not wish to participate in visits there going forward. The social worker again reached out to A.L. to encourage

---

[11] At the time, the court had ordered nine hours of visitation to A.L. over the summer. A.L. had been receiving three hours of visitation. In response to the order, the social worker submitted a visitation referral for nine hours, but A.L. received only an additional three hours of visitation, for a total of six hours.

her to accept the weekly hours that she would be able to visit at the visitation center, but A.L. failed to do so. As a result, A.L.'s referral at the visitation center was terminated. In November 2024, the Agency resubmitted the referral and A.L. was placed on a waiting list. Because A.L. had not followed through on the referral, she was only participating in three hours of visits per week at the time of the hearing.

In December 2023, the Agency evaluated Martha to be a visitation supervisor for A.L. The social worker completed the background check and discussed it with her supervisor, but Martha was not approved at that time because of a concern A.L. was in a relationship with Martha's son. There had been visitation reports that noted an unidentified male (who was believed to be A.L.'s boyfriend) showed up at visits. Earlier in the case, the social worker had visited the home and found unsafe and unsanitary conditions, and Martha was late to the appointment; she was not approved as a supervisor. The details of the assessment were not included in the Agency's report.

Martha was reassessed in April 2024. During that reassessment, she was asked to attend a meeting. Martha was 30 minutes late to the appointment. There were already concerns A.L. was arriving late to visitation. It did not appear at that time Martha would be a reliable and neutral supervisor. Although the Agency reassessed Martha each time it was ordered to do so by the court, the details of the social worker's assessments were not always included in the reports she prepared. Information about the assessment, however, would have been discussed with A.L. at monthly visits or meetings, when she attended them. In March 2025, Martha was finally approved to supervise but had not yet done so at the time of the hearing due

to the caregiver's unavailability to provide transportation for F.M. to attend the visits.

The social worker had difficulty throughout the case scheduling compliance visits and meetings with A.L. For example, A.L. often said a time did not work for her or Martha, and A.L. wanted not only Martha, but also her lawyer and therapist to be present at meetings, which made them difficult to coordinate. The last time A.L. and the social worker had met for a compliance visit was in February 2025, but there were several periods in the case where they did not meet for months. Despite these barriers, the social worker had been able to consistently provide the necessary visitation and service referrals throughout the case.

The social worker acknowledged F.M.'s caregivers had been somewhat difficult to work with regarding visitation. The grandmother had been very cooperative in transporting F.M. to in-person visits but did push back early in the case regarding phone calls. She had complained to the social worker she had to jump through hoops to accommodate A.L. A.L. had said she was not comfortable initiating the phone calls, so the arrangement had been changed so that the maternal grandmother was instructed to initiate them. The maternal grandmother had sent the worker screenshots of her call logs showing her multiple attempts to call A.L. and multiple instances where A.L. did not answer. The social worker had stepped in to work with A.L. and the grandmother to schedule makeup phone calls. The social worker did not believe the grandmother had interfered in A.L.'s reunification efforts.

The social worker did not have any specific concerns regarding A.L.'s residence should F.M. be released to A.L.'s care. But she did not believe F.M. would be safe in A.L.'s care because she remained concerned about unresolved mental health and/or substance abuse issues. She testified that,

40

due to A.L.'s infrequent contact with her, it had been difficult to assess her ability to maintain F.M. safely in her care.

Minor's counsel for F.M. argued there was a substantial risk of detriment to F.M. if she were returned to A.L.

*I. Court's Ruling*

The Agency recommended the court set a hearing under section 366.26 as to F.M., B.M., and W.M.[12] On April 21, 2025, the juvenile court terminated reunification services, found by clear and convincing evidence the parents had been offered reasonable reunification services, and ordered the setting of a hearing under section 366.26 as to F.M., B.M., and W.M. Pending the hearing, the court also ordered monthly updates from the Agency regarding the parents' visits with the children. The court noted the problem in this case is "not quantitative but qualitative, whether all the counseling, therapy, or parenting classes are doing any good." The court noted A.L.'s slow progress in her services and the therapist's note at the end of her prior counseling that she had not made progress in her therapy goals. The court considered it most concerning that A.L. continued to exhibit poor self-regulation during visits with F.M., lashing out at others even if she was loving in her interactions with F.M. A.L. interjected during the court's comments from the bench and abruptly left the courtroom while the court was orally explaining its ruling.

---

[12] The Agency also recommended the court set a hearing as to L.M. However, the court granted N.C.'s motion pursuant to section 350, subdivision (c), to return L.M. to N.C.'s care based on the social worker's testimony at the review hearing. There is no petition as to L.M. pending, but Father filed a separate appeal as to L.M. that is pending.

The court further found Father "has continued to present in an erratic, compulsive and combative manner." The court found B.M. and W.M. were differently situated than L.M. with respect to their relationship with their mother, N.C., and noted their multiple removals from the parents over the years and their desire for stability.

All three petitioners filed timely notices of their intent to challenge the April 21, 2025 order terminating reunification services and setting a hearing under section 366.26 for B.M., W.M., and F.M.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S

FINDING OF DETRIMENT AS TO A.L.

A.L. contests the juvenile court's finding, made by a preponderance of the evidence, that returning F.M. to A.L. would create a substantial risk of detriment to F.M.'s safety, protection, or physical or emotional well-being. (§ 366.22, subd. (a)(1).) Specifically, A.L. contends the Agency's ongoing concern A.L. may have unresolved substance abuse and mental health issues was purely speculative and there is, therefore, no substantial, credible evidence, supporting the court's finding. A.L. emphasizes she successfully completed her case plan—individual therapy and parenting classes—and learned from her services, addressed the issues that led to F.M.'s dependency, and showed she understood and was capable of meeting F.M.'s needs. Based on our review of the record and the evidence before the juvenile court at the time of the final permanency review hearing, we conclude substantial evidence—not just speculation—supports the court's

42

finding of a substantial risk of detriment to F.M. if she were returned to A.L.'s care.

At the time of an 18-month permanency review hearing, the juvenile court "shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) The Agency has the burden of establishing detriment. (*Ibid*.) Appellate courts review a dependency court's finding of detriment for substantial evidence, asking only whether the finding is supported by evidence that is "'reasonable, credible[,] and of solid value.'" (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.)

In reviewing the record, we draw all reasonable inferences from the evidence to support the court's order, review the record in the light most favorable to the court's determinations, and note that issues of fact and credibility are the province of the trial court. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"In determining whether it would be detrimental to return the child at the 18-month review, the court must consider whether the parent participated regularly in any treatment program set forth by the plan, the 'efforts or progress' of the parent, and the 'extent' to which the parent 'cooperated and availed himself or herself of services provided.'" (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) "[T]he notion of detriment is at best a nebulous standard that depends on the context of the inquiry," but "'[i]t cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family

43

member.' Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.) "Detriment can be shown many different ways." (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059.)

Applying these standards, we conclude substantial evidence supports the juvenile court's finding of a substantial risk of detriment to F.M. if she were returned to A.L.'s care. From the inception of the proceeding to the final review hearing, A.L. continued to show difficulty regulating her emotions, irrational reactions to adverse situations, and self-centeredness. Although A.L. repeatedly stated a desire to assume full care of F.M., she failed and refused to do what was necessary and appropriate to alleviate legitimate concerns about whether she could do so, including concerns about potential substance abuse and unresolved mental health issues. A.L. also never progressed beyond minimal supervised weekly visitation with F.M., who had not lived with, or been parented by A.L., for many years.[13]

A parent's efforts and progress toward ameliorating the initial reasons for the dependency is of particular importance in determining

---

[13] The record reflects A.L. was never ordered more than nine hours of weekly visitation, and she stipulated at the combined six- and 12-month review hearing in May 2024—more than a year into the proceedings—that her reunification services up to that point had been reasonable. To the extent she was unable to utilize all nine hours of visitation in the period leading up to the final review hearing, as discussed further below, the record shows A.L. was at least partially to blame. For instance, there was a period in which A.L. had the opportunity to utilize six hours of weekly visitation, but she refused the offer because she was not being offered her full allotment of hours ordered by the court. Declining all visitation because she was not offered everything to which she was entitled is further evidence of A.L.'s self-

detriment. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343–1345.) Here, the sustained petition alleged a history of domestic violence between A.L. and Father and alleged A.L. knew Father was not caring properly for F.M.—yet left her in Father's exclusive care. A.L. made no effort to try to obtain custody of F.M. or court-ordered visitation, and failed to protect F.M. and ensure her education and developmental needs were being met. When the Agency first located A.L. after F.M.'s detention, A.L. refused to provide the Agency with her address or allow them to contact her parents (with whom A.L. was living at the time) in order to perform an assessment.

A.L.'s combative behavior, inability to regulate her emotions (even in front of F.M.), and consistent focus on herself, is well documented in the record. Even at the final review hearing, A.L. abruptly left the courtroom while the court was addressing her.

The juvenile court noted the following regarding A.L., among other things: "The therapist reported that [A.L.] struggled with accepting responsibility for her actions and lacked motivation to gain insight. She struggled with interacting with her therapist and the assigned social worker. She was often defensive, reactive, and combative. She appeared to struggle with consistency and stability, was often late or did not show up for appointments and visits, and showed poor response in her attempts to communicate with her. [¶] Of most concern was her continuing to exhibit poor self-regulation during visits with [F.M.]. She made consistent efforts to be more attentive and loving to [F.M.] during visits after she was redirected, but she could be highly reactive and lash out at others in the presence of her child." The juvenile court heard testimony, including A.L.'s and the social

centeredness and lack of focus on the ultimate goal of obtaining care of F.M., as well as her inability to deal rationally with adverse situations.

45

worker's, and reviewed the reports submitted by the Agency, and was in the best position to evaluate credibility, the progress A.L. made in alleviating the concerns that led to F.M.'s detention, and the risk of harm to F.M. if returned to A.L.'s care.

The sustained amended petition also alleged A.L. may have unresolved substance abuse issues and mental health issues. Although the "extent to which [a parent] availed themselves of services provided" is a relevant factor for the juvenile court's consideration (§ 366.22, subd. (a)(1)), A.L. did not take reasonable steps to eliminate these concerns. She refused to voluntarily drug test solely because the court had not ordered it. The social worker testified at the final review hearing the Agency was still concerned about unresolved mental health and substance abuse issues. And A.L.'s lack of cooperation with monthly compliance meetings made it difficult for the Agency to observe A.L.'s day-to-day wellbeing. Minor's counsel for F.M. argued that drug testing would have helped her assess whether F.M. would have been safe in A.L.'s care. In the end, F.M.'s counsel recommended not returning F.M. to A.L.'s care.

As to the Agency's ongoing concerns about unresolved mental health issues, A.L. provided a fake letter purportedly from a mental health provider who had treated A.L. Later, A.L. voluntarily underwent a psychological evaluation and provided a letter to the court purportedly from a provider concluding she has no mental health issues. Upon request by the Agency, however, A.L. refused to sign a release-of-information to permit the Agency to verify the letter and review the actual psychological evaluation because the evaluation had not been ordered by the court.

A.L. argues that because she did not drug test or provide a psychological evaluation, the court's finding of detriment is necessarily based

only on speculation. We disagree. A.L.'s confrontational attitude, inability to regulate her emotions, and volatility, combined with information reported to the Agency by the maternal grandmother regarding A.L. appearing to be "'strung out'" during one or more visits with F.M., and A.L.'s history of drug use reported by the maternal grandmother and N.C., reasonably led the Agency to be concerned about unresolved issues. A.L.'s own therapist noted in reports provided to the Agency, which were before the juvenile court, that A.L. had a history of self-medicating with substances. A.L.'s denial of unresolved issues, but refusal to do the minimum to *show* that the issues had been resolved, only exacerbated the Agency's concerns. A.L. proved to be her own worst enemy.

As to the sustained petition's allegations regarding A.L.'s ability to protect F.M., there was evidence in the record to suggest A.L. allowed a man involved in serious criminal conduct and substance abuse to attend visits with F.M. A.L. denied having a relationship with him, but the Agency did not believe A.L. was being forthcoming.[14]

Finally, A.L. places great emphasis on her compliance with her case plan in the months leading up to the final review hearing and contends the detriment finding cannot be based on "patterns of instability" that pre-dated the review period that was the subject of the 18-month review hearing. We disagree. Compliance with a case plan is not dispositive on the issue of detriment. (See *A.H. v. Superior Court, supra*, 182 Cal.App.4th at p. 1059; *In re Chantal S.* (1996) 13 Cal.4th 196, 201 ["When . . . a juvenile court hears a dependency case under section 300 of the Welfare and Institutions Code, the

---

[14] There is evidence in the record to suggest the man with whom A.L. was involved was Martha's son.

47

court deals with children who have been seriously abused, abandoned, or neglected. The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child"].)

Based on the foregoing, we conclude the court's detriment finding is supported by substantial evidence.

## II.

### THE COURT'S FINDING THAT REASONABLE REUNIFICATION SERVICES WERE PROVIDED IS SUPPORTED BY SUBSTANTIAL EVIDENCE

All three petitioners contend the juvenile court erred in finding they were provided reasonable reunification services in the period between the six- to 12-month review hearing and the final review hearing, when the court terminated reunification services and ordered a section 366.26 hearing be scheduled. We disagree and conclude substantial evidence supports the court's findings as to each petitioner.

### A. Standard of Review

At the 18-month review hearing, "[t]he court shall not order that a hearing pursuant to [s]ection 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.22, subd. (b)(3)(C)(iii).) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn

48

reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

"The adequacy of reunification plans and the reasonableness of . . . SSA's efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'" (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) Even if services are imperfect or more services could have been provided, "[t]he standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

*B. The Trial Court's Finding Regarding N.C. is Supported by Substantial Evidence*

N.C. contends the juvenile court erred in terminating reunification services before first ordering individual and conjoint therapy with B.M. and W.M. focused on family reunification, and that it abused its discretion in denying N.C.'s request for an extension of the reunification process pursuant to section 352 for this therapy to occur.[15] Although the court had ordered 10 hours of weekly supervised visitation, the boys refused to participate in more than three hours per month. N.C. contends reasonable

---

[15] The boys repeatedly declined to participate in family/conjoint counseling with either parent.

49

efforts toward family preservation should not have given way to the boys' preference to be adopted and reminds us that "up until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

As N.C. acknowledges, "the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) A juvenile court is not required to force a child to visit a parent against his or her will. (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1238.) N.C. further acknowledges it is "not the court's duty to ensure . . . particular efforts were ultimately effective in overcoming [a child's] opposition to visitation," and that "[t]he reality in many of these cases is that the parent has irreparably damaged the relationship beyond salvage. . . . But if it turns out, after reasonable efforts have been exhausted, the child simply cannot be persuaded to visit, that, in and of itself, is not a basis for reversal." (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1047.) N.C. nevertheless argues that forcing the boys to try to reunify with her would not be detrimental to them because she had not irreparably damaged her relationship with them. She argues the boys did not decline to attend visits out of fear or other aversions arising from N.C.'s conduct, but because they simply did not want to go.

We sympathize with N.C.'s desire to connect with her sons despite their refusal to visit with her, understand the importance of visitation to reunification, and commend N.C. for the substantial progress she made in her case plan. We nevertheless conclude substantial evidence in the record supports the juvenile court's finding N.C. was provided reasonable

reunification services leading up to the final review hearing. Specifically, there is substantial evidence the Agency's efforts with respect to visitation were reasonable under the circumstances.

The social worker testified she repeatedly encouraged the boys, who were 12 and 10 years old, to visit with N.C. and explained to them the positive progress their mother had made.[16] But in the end, she felt she could not force them to go unwillingly. The social worker also offered to have the boys visit at N.C.'s home after they enjoyed their past contact there, but they still refused. She also explored with N.C. the possibility of neutral monitors for in-home contacts. Perhaps there may have been other or more effective means to encourage the boys to visit more often with N.C. But the question is not whether the Agency could have done more, but whether what it did was *reasonable*. "[T]he mere fact that more services could have been provided does not render the [Agency]'s efforts unreasonable." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973; see *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Indeed, N.C. acknowledges the social worker did not "sit idly by and merely allow the boys to refuse visits."[17] This distinguishes this case from those in which other courts have held it improper to delegate to the

---

[16] The juvenile court also strongly encouraged the boys to attend visits with both N.C. and Father.

[17] N.C. acknowledges the Agency's efforts "entailed telling the boys the visitation schedule, asking if they wished to attend, discussing their thoughts and feelings toward [N.C.], encouraging them to attend more than once monthly, speaking to the boys about how well [N.C.] was doing, and inexplicably telling them they could have additional visits while they persistently declined to attend the majority of those that had been court-ordered." According to the Agency, the boys' caregivers also encouraged the boys to attend visits.

dependent children the power to veto all visits. (See *In re S.H., supra,* 111 Cal.App.4th at pp. 317–320; *In re Hunter S.* (2006) 142 Cal.App.4th 1497.) As long as the juvenile court's visitation order does not expressly or implicitly grant a child a veto power over visits, a child's refusal to attend certain visits does not constitute an impermissible delegation, at least without proof that the court failed to act when the child's refusals were brought to its attention. (*In re Sofia M., supra,* 24 Cal.App.5th at p. 1046.) Indeed, "[w]hen a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order."[18] (*Ibid.*)

N.C. argues it was incumbent on the Agency to facilitate both individual and conjoint counseling focused on family reunification because the social worker's efforts to convince the boys to visit were futile. We disagree. As both parties recognize, the Agency need not provide *perfect* services or take every conceivable step to satisfy its duty to provide reasonable services. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969; *In re Misako R., supra,* 2 Cal.App.4th at p. 547.) And unlike visitation,

---

[18] N.C. did not seek relief from the court regarding the alleged non-compliance with the visitation order until March of 2025—late in the proceedings.

N.C. did not have a statutory right to conjoint therapy.[19] (§ 362.1, subd. (a)(1)(A); *In re F.P.* (2021) 61 Cal.App.5th 966, 975.)

*C. The Trial Court's Finding Regarding Father is Supported by Substantial Evidence*

Father contends he was denied reasonable reunification services because he never received his ordered full six-hours of visits with B.M. and W.M. because they declined to visit with him, and the Agency did little to facilitate the visitation other than encouraging the boys to attend visitation and conjoint therapy with Father and offering to accompany them on the visits. He contends visits with his daughter, F.M., never increased past monitored visitation despite positive interactions and consistent visitation. Father contends the Agency did not do enough to facilitate visitation and therapy.

Having reviewed the record, we conclude that, although Father did not receive the full allotment of visitation and related services that would have been ideal, the Agency's efforts under the circumstances were reasonable.

Substantial evidence supports the finding of reasonable services as to B.M. and W.M. during the relevant time period. When the boys declined to visit with Father, the social worker spoke to them at each compliance visit about what could be done to make them more comfortable visiting with Father, offered to supervise contacts herself, and offered telephonic visitation

---

[19] A referral for conjoint counseling was not submitted until August 2024. N.C. points out it took roughly 18 months for this service to become available after the court ordered the Agency to report on the appropriateness of conjoint counseling. The court did ultimately approve conjoint therapy, but both boys refused to participate.

as an option. They steadfastly rejected all her suggestions.[20] Conjoint therapy with the boys also was offered, but the boys refused to attend. For the same reasons discussed above in connection with N.C.'s petition, we conclude the Agency's efforts were reasonable under the circumstances. On the facts here, the Agency's duty to provide reasonable reunification services did not require the Agency to force the boys to visit and attend therapy with Father.

The finding of reasonable services as to F.M. is also supported by substantial evidence. Father's principal complaint is that he was not allowed to proceed past monitored visitation. The record supports the Agency's contention that although F.M.'s visits with Father were positive, they did not reach the unsupervised stage due to Father's erratic, offensive, and troubling communications during the dependency proceedings, which is well documented in the record and reasonably supported a finding that supervised visitation was reasonable.

*D. The Trial Court's Finding Regarding A.L. is Supported by Substantial Evidence*

A.L. bases her petition on the Agency's failure to provide her the full nine hours of weekly visitation ordered by the court and its delay in evaluating and approving A.L.'s friend, Martha, as a visitation supervisor. A.L. points out she was not provided the amount of visitation ordered by the

---

[20] At the combined six and 12-month review hearing, the court ordered the Agency to refer B.M. and W.M., along with two of their older siblings, to in-person conjoint counseling with Father. The Agency was ordered to speak with the boys' caretakers about not scheduling conflicting events with visitation.

juvenile court and argues the social worker never considered liberalizing A.L.'s visits.

The record shows that in the beginning of the summer before the final review hearing, A.L. was visiting with F.M. six hours per week, despite the court ordering nine hours of visitation during the summer break. The Agency changed one of A.L.'s visitation days unilaterally, which purportedly did not work for A.L.'s schedule, leaving A.L. with only three hours of visitation over the summer with F.M. The Agency promptly attempted to remedy the conflict and accommodate both A.L.'s and F.M.'s schedules. Ultimately, A.L. was offered an additional three hours of visitation (which would have brought her back to six hours a week), but she rejected it, stating she preferred not to visit at all if she could not receive all nine hours of visitation ordered by the court.[21] Although visitation and the Agency's efforts were not perfect during this period, the record supports the trial court's finding that services were reasonable under the circumstances.

Similarly, the difficulties A.L. encountered in having daily telephone calls with F.M. as ordered by the court were partly caused by A.L. (who acknowledges she could be difficult when it came to visitation), and circumstances outside of the Agency's control. The Agency did reasonably attempt to remedy issues between the caregiver that interfered with A.L.'s ability to have regular calls with F.M., including having the caregiver initiate the calls with F.M. and scheduling makeup calls.

Finally, the Agency's delay in obtaining approval for Martha to supervise visits does not mandate reversal of the juvenile court's finding that

_____

[21] This behavior by A.L. calls into question the sincerity of her desire to see F.M. and suggests she was more interested in being combative with the Agency than in spending time with her daughter.

A.L.'s services were reasonable under the circumstances. The social worker had evaluated Martha to supervise visits in late 2023, completing a background check and discussing it with her supervisor. The Agency did not approve Martha to supervise at that time because of a concern A.L. was in a relationship with Martha's son, who had been believed to be present at visits and about whom A.L. had been evasive. The social worker had also visited Martha's home and found unsafe and unsanitary conditions, and Martha was late to a prescheduled appointment. The Agency assessed Martha again in April 2024 and again concluded she would not be a reliable and neutral supervisor. Each time the Agency was directed to do so, it reassessed Martha as a potential visitation supervisor. Ultimately, Martha was approved to supervise as the final review period neared its conclusion, but by then A.L. had wavered on whether she wanted Martha to do so. Although it appears A.L. later changed her mind, there is substantial evidence the Agency's actions on the whole with respect to facilitating visitation for A.L. were reasonable.

## DISPOSITION

The writ petitions are denied. Our order staying the hearing under section 366.26 is hereby dissolved, and the juvenile court is ordered to reschedule and conduct the section 366.26 hearing as expeditiously as possible.


                                        GOODING, J.

WE CONCUR:


DELANEY, ACTING P. J.


SCOTT, J.